
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 2, 2017

**WAYNE SELLERS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-00442      J. Robert Carter, Jr., Judge**

**_____**

**No. W2016-01776-CCA-R3-PC**

**_____**

Wayne Sellers ("the Petitioner") appeals the denial of post-conviction relief from his 2013 Shelby County Criminal Court conviction for aggravated rape, for which he received a sentence of twenty-three years' incarceration. In this appeal, the Petitioner contends that he was denied the effective assistance of counsel based on trial counsel's failure to explain the defense strategy to the Petitioner and object to the victim's in-court identification of the Petitioner. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Andrew S. Deshazo, Memphis, Tennessee, for the appellant, Wayne Sellers.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton Bush, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

*Trial*

On direct appeal, this court summarized the proof at trial as follows:

[The Petitioner] was indicted for the aggravated rape of S.M., a 64-year-old woman. The victim was living in Memphis in December of 2011. The morning of the incident, S.M. set out on foot from her apartment in East Camilla Towers with her "red cart" and her "bags" to pay her bill at a storage facility. She was notified that her account was in arrears and she needed to pay $267 or the facility would sell her belongings. S.M. used the red cart like a walker to help her mobility. She intended to purchase a money order at the Kroger on Frayser Boulevard before returning to the storage facility. On the way to the bus stop, she got a chicken sandwich, a diet soda, and two orders of french fries at Checkers. S.M. then tried to figure out how to "catch a trolley or how to catch the bus." She saw a police officer directing traffic for a "relay race" and asked how to get to the Kroger. She ended up going the "wrong way."

As she walked, she met a man who introduced himself as "Tyrone Jenkins." He started to follow her and asked her where she was going. He offered to "show" her how to get to the bus. S.M. explained, "[l]ike a stupid fool I followed him like a dummy because I didn't want to go. I was scared and I was frightened so I pushed myself to go so I could get that money order sent out before it got too late." S.M. followed "Tyrone" under a bridge and into a field. At that point, she was "scared" and wanted to "take off" but her foot and left hip "froze."

At that point, "Tyrone" took her cart and "threw it against the weeds." S.M. explained that he "drug [her] clothes off . . . and then put his arm around [her] neck . . . and then he threw [her] down on the ground" on her back. "Tyrone" pulled her clothes and shoes off and got on top of her. S.M. tried to push him away but was unsuccessful. "Tyrone" told her to "relax" and not to say anything while he forced his penis into her vagina. This lasted "for a long time" before "Tyrone" climaxed. S.M. stated that it "hurt." When the incident was over, "Tyrone" left and S.M. screamed. "Tyrone" then came back, and helped S.M. put her shoes back on her feet before running away. As he ran away, he told S.M. where to catch the bus. S.M. managed to walk to a nearby tobacco plant and asked someone to call an ambulance.

Officer Wayne Ackerman of the Memphis Police Department arrived on the scene to find the S.M., whom he described as a "very emotional" woman "in her seventies or eighties maybe, . . . short, soiled clothing, didn't smell very nice, dirty." S.M. reported that she was forced to walk into the woods before she was raped. Officer Ackerman accompanied S.M.

to the hospital while he sent another officer out to locate the scene of the rape.

While at the hospital, Officer Ackerman sat with S.M. for "probably two, three hours." During that time, no doctors examined S.M. Lieutenant Stephen Oliver came to the hospital to assist in the investigation; Officer Ackerman talked with him briefly. Shortly thereafter, a nurse gave Officer Ackerman the victim's chart and told him that S.M. was ready to be discharged. The officers planned to take S.M. from the hospital to the Rape Crisis Center for a rape kit exam. S.M. asked if she could use the restroom. When she stood up, Officer Ackerman noticed a "large puddle of blood that had pooled while she was laying down." The "bed was full of blood," and Officer Ackerman and Lieutenant Oliver "helped [S.M.] have a seat back on the bed and called for nurses and doctors." S.M. was finally examined and received "minor surgery" to place eight stitches in her vaginal area.

While at the hospital, S.M. spoke with Lieutenant Stephen Oliver. She was able to give a physical description and first name of her attacker, "Tyrone."

Once S.M. was released from the hospital, the officers transported her to the Rape Crisis Center of Memphis. Tammy Keough from the Rape Crisis Center of Memphis testified for the State as an expert in sexual assault nurse examination. She examined S.M. on December 3, 2011. S.M. complained of pain around her neck as a result of the incident. As part of the examination Ms. Keough took photographs of S.M.'s neck with a forensic light to check for bruising under the skin. S.M. had bruises consistent with someone applying pressure to her neck and collarbone area. The bruises were not visible to the naked eye but could be seen with the forensic light and were visible in the photographs taken with a special filter. The victim also had scratches on the back of her arms and legs but reported that she did not receive them from the incident and refused to allow Ms. Keough to photograph these injuries. The victim denied having consensual sex in the previous four days. The victim was not able to "tolerate" an examination of the vagina with a speculum. Ms. Keough described the visual examination of the victim's vagina as follows:

> [T]here was dried blood over the entire area and then these were basically stitches, sutures or stitches, that I was able to see . . . . [L]eading from the outside of her vagina towards the anus was where the stitches were between her vagina and the anus . . . .

The first stitch was at the beginning of the fossa navicularis, a boat-shaped depression between the vagina/hymen and the frenulum, and extended through the posterior fourchette, the muscular area between the vagina and the anal area. Ms. Keough was not able to ascertain how many, if any, stitches were on the inside of the vagina because "there was a lot of blood and [the examination] was very painful [to the victim]." Ms. Keough took photographs of the victim's vagina as part of the examination. Two photographs were admitted into evidence. One photograph depicted the victim's vagina prior to examination. The second photograph depicted the victim's vagina with the labia opened. Ms. Keough opined that the victim's injuries were "consistent with a blunt penetrating injury." During the examination, Ms. Keough collected DNA samples from the victim's cheek, her vulva, and her vagina.

As a result of the information that S.M. supplied to officers on the day of the incident, Wayne Tyrone Sellers, [the Petitioner], was identified as a suspect. Lieutenant Oliver attempted to locate S.M. in order to present her with a photographic lineup of potential suspects. He eventually located her at the hospital, where she had been readmitted for five days as a result of losing two pints of blood from her injuries.

When shown the photographic lineup two days after the incident, S.M. was unable to identify [the Petitioner]. She explained that her "memory . . . went kind of fast and [she] couldn't remember too well." She admitted that she saw [the Petitioner] "face to face" but "just blocked [it] out of my mind." Several days later she recognized [the Petitioner] when "[the Petitioner] came back into that building [where she lived]" and the victim saw him. She immediately called the police. S.M. admitted that [the Petitioner] was the only person in the courtroom, beside the attorneys and the police officers, when she identified him at trial.

[The Petitioner] was brought in for questioning. He was "cooperative" and agreed to provide a DNA sample. He denied all of the allegations.

Tennessee Bureau of Investigation Special Agent Lawrence James testified as an expert in the area of DNA analysis and serology. Having tested the samples from the victim and [the Petitioner], Special Agent James opined that "the profile indicated there was more than one person's DNA present in that profile and the profile that I got was consistent with the mixture from [the victim] and [the Petitioner]." Special Agent James explained that

- 4 -

the probability that an unrelated individual would be included as a contributor to this DNA mixture was approximately one in 17.3 million based on the number of individuals from the African-American population. He explained that any time there was a "mixture" of DNA in a sample, the probability is increased but that, in his opinion, the DNA of [the Petitioner] was present in the sample.

[The Petitioner] presented no proof. After deliberating, the jury found [the Petitioner] guilty of aggravated rape as charged in the indictment.

*State v. Wayne Sellers*, No. W2013-02771-CCA-R3-CD, 2014 WL 6491070, at *1-3 (Tenn. Crim. App. Nov. 20, 2014), *perm. app. denied* (Tenn. Apr. 14, 2015) (footnotes omitted). This court affirmed the Petitioner's judgment of conviction, and the Tennessee Supreme Court denied further review. *Id.*

## Post-Conviction Proceedings

Thereafter, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition.

At an evidentiary hearing, the Petitioner testified that he and trial counsel discussed "[t]o a certain degree" what evidence the defense would present at trial. The Petitioner testified that the defense was to be based on "what was strong in [his] case," including a lack of identification, errors in the police reports, and issues relating to the DNA evidence. The Petitioner acknowledged that the jury heard that the victim could not pick him out of a photographic lineup. However, he also acknowledged that there was proof that he was a contributor of the DNA found on the victim's vaginal swabs.

The Petitioner recalled that he did not testify at trial and that trial counsel called no witnesses on his behalf. The Petitioner explained that his decision not to testify was influenced by trial counsel's advice that it was not in the Petitioner's "best interest" to testify. However, the Petitioner stated that he now believed he should have testified and "made some type of . . . plea of self-defense." According to the Petitioner, if he had taken the stand at trial he would have testified about his character and how he had no record of violence.

The Petitioner recalled that the State made two plea offers—the first offer was for fifteen years and the second was for eight years—but stated that he rejected both offers based on a "lack of . . . understanding[.]" The Petitioner stated that the victim never identified him prior to trial, and her in-court identification was improper. The Petitioner

explained that, when the victim made the identification at trial, he was seated by trial counsel wearing a jumpsuit from the jail, and there were no other inmates in the courtroom. The Petitioner testified that trial counsel failed to object to the identification as being unconstitutionally suggestive.

On cross-examination, the Petitioner acknowledged that he did not have an expert that could dispute the DNA testimony at trial. The Petitioner acknowledged that he stated in his original petition that there was a "possibility" that a family member may have committed the rape. The following exchange then took place:

[THE STATE]: Is there somebody who did this that you know of?

[THE PETITIONER]: Technically, no.

The Petitioner stated that he had an uncle "Thomas," who knew the victim, and the Petitioner recalled that he made trial counsel aware of this fact. The Petitioner acknowledged, however, that he did not provide trial counsel with his uncle's "direct name." Moreover, the Petitioner told trial counsel that it "wasn't going to help [his] case." The Petitioner acknowledged that he did not provide trial counsel with any names of potential alibi witnesses.

The Petitioner agreed that trial counsel discussed the Petitioner's prior convictions, and he acknowledged that he had two prior convictions for simple assault and four domestic violence convictions. However, he stated that, had he testified, he could have explained that most of the records of his convictions contained mistakes.

Trial counsel testified that he was employed with the Shelby County District Public Defender's Office and that he had worked in that office for twenty-one years. For the last seventeen or eighteen years, trial counsel had been assigned to criminal court, handling "primarily serious felonies." Trial counsel testified that he represented the Petitioner on two cases in which the Petitioner was charged with aggravated rape. When he was first appointed to represent the Petitioner, trial counsel requested a mental evaluation; however, the Petitioner was found competent to stand trial, and the doctors did not make any other findings of note. Trial counsel stated that the Petitioner was "very difficult to work with" because there were times when the Petitioner would not talk to trial counsel. Trial counsel explained that the Petitioner "would say things like it'll work out or God will work it out and just wouldn't talk to [trial counsel]." Trial counsel recalled asking the Petitioner for names of witnesses that could support the Petitioner's version of the facts. The Petitioner mentioned his uncle, but he did not provide trial counsel with anything specific "as far as names, addresses, [or] phone numbers" of witnesses to call on the Petitioner's behalf. Trial counsel testified that his difficulties

with the Petitioner included the Petitioner's "stories not being consistent and changing and just not really wanting to understand or . . . to address what he was facing."

Trial counsel conveyed two plea offers to the Petitioner, which would have resolved both of the Petitioner's cases. He discussed the offers with the Petitioner and the option of proceeding to trial. Trial counsel also discussed with the Petitioner the DNA evidence and that the "victim's story was going to be very sympathetic to the jury." Accordingly, trial counsel encouraged the Petitioner to accept the offers. The Petitioner rejected both offers, however, because he was adamant that he would not be convicted of one of the offenses.[1] Trial counsel recalled that, when the instant case was set for trial and before the jury was sworn, he put the Petitioner on the stand and questioned him about the State's plea offer. On both occasions, the Petitioner indicated that he would not accept the State's offer and that he wanted to go to trial.

Trial counsel recalled that the victim could not identify the Petitioner in a photo array but that she identified him in court. Trial counsel agreed that the Petitioner was the only person in court dressed in a jail jumpsuit at the time of the identification. However, trial counsel believed that the DNA was the "more damning" evidence, and he had discussions with the Petitioner about that aspect of the case. Trial counsel stated that he had reviewed the chain of custody for the DNA evidence and had found no issue with it.

Trial counsel stated that he conducted a *Momon* hearing with the Petitioner, in which the Petitioner indicated that he did not wish to testify. Trial counsel recalled that, before the Petitioner made the decision, he discussed with the Petitioner the advantages and disadvantages of the Petitioner's testifying.

On cross-examination, trial counsel explained his failure to object to the victim's in-court identification of the Petitioner, as follows:

> I did not object to that. We argued that -- I probably argued that in closing. But, again, his case was the DNA, it wasn't the identification of the victim. She admitted that she didn't identify him and couldn't identify him. But, yes, obviously when you're the only one sitting in court in your jail clothes, yes, I mean . . . it's pretty obvious that you're the only one that's going to be picked out. I did, however, offer to give him some clothes and he didn't want to wear clothes, he wanted to wear his jail clothes. I have a note actually of that in my file. Well if that would have helped or not I don't know. But I did not object to her picking him up -- picking him out, no.

---

[1] Trial counsel testified that the State ultimately dismissed one of the Petitioner's aggravated rape charges.

Following the hearing, the post-conviction court denied relief in a written order. The post-conviction court found that the Petitioner expressed "general dissatisfaction with counsel's performance based upon an unfavorable result. He offers no evidence of any deficiencies in the preparation for or execution of the trial strategy." The court found that the Petitioner "offer[ed] no proof of anything that could have been done differently. Specifically, his testimony about self-defense and cryptic references to an uncle do not amount to any suggestion that his trial counsel's performance was deficient in any way." This timely appeal follows.

## Analysis

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a trial court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. *Id.* (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015).

When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." *Fields*, 40 S.W.3d at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Id.* (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457.

### Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee

cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

Failure to Explain the Defense Strategy

On appeal, the Petitioner asserts that he was denied the effective assistance of counsel because trial counsel did not inform the Petitioner that trial counsel would not present any proof at trial. The Petitioner contends that had he known that trial counsel would put on no proof, he would have "taken the stand to defend himself and offer some context for the testimony that the jury heard during the State's case[,]" which would have materially affected the outcome of the case. He asserts that trial counsel's failure to communicate with him regarding the defense strategy "ultimately resulted in [the Petitioner] making what he now deems an ill-advised decision not to testify." The Petitioner also contends that trial counsel's failure to communicate with him about the lack of defense proof caused him to refuse a favorable plea offer from the State. The

Petitioner contends that, had he known that trial counsel would put on no evidence, he would have taken the plea offer of eight years. The State responds that the Petitioner's claims are not supported by the facts and that the Petitioner knew that trial counsel did not have any proof to present at trial. We agree with the State.

At the post-conviction hearing, trial counsel testified that he discussed the case with the Petitioner, including the DNA evidence and the sympathetic victim. Trial counsel testified that he asked the Petitioner for names of witnesses that could support the Petitioner's version of the facts. Although the Petitioner mentioned his uncle, he did not provide trial counsel with anything specific "as far as names, addresses, [or] phone numbers" of witnesses to call on the Petitioner's behalf. The Petitioner acknowledged that he did not provide trial counsel with any names of potential alibi witnesses, and he did not give trial counsel his uncle's complete name. There is nothing in the record to suggest that the Petitioner had any reason to believe that trial counsel had come up with any evidence to present at trial.

Moreover, a review of the trial transcript shows that the Petitioner acknowledged that he knew trial counsel would not present any evidence if the Petitioner decided not to testify. During the Petitioner's *Momon* hearing, the following exchange took place:

> [TRIAL COUNSEL]: . . . [Y]ou do not wish to testify in your behalf. Is that correct?
>
> [THE PETITIONER]: Yes, sir. That's it. That is correct.
>
> [TRIAL COUNSEL]: The good, the bad, the ugly of whatever may come you're – you're okay sitting here. We don't have any other witnesses. Is that correct?
>
> [THE PETITIONER]: Yes, sir. Yes, sir.
>
> [TRIAL COUNSEL]: No alibi witnesses, nothing of that nature so this would effectively - we would rest as well today. Do you understand that?
>
> [THE PETITIONER]: Yes, sir.
>
> [TRIAL COUNSEL]: And that's what you wish to do?
>
> [THE PETITIONER]: Yes, sir.

Because the record clearly shows that the Petitioner knew that trial counsel had no proof to present, the Petitioner has failed to establish deficient performance. Furthermore, the Petitioner has failed to establish that the result of the trial would have been different had the Petitioner testified. We agree with the post-conviction court, the Petitioner's proposed trial testimony "about self-defense and cryptic references to an uncle" are insufficient to establish prejudice under *Strickland*. There is also no proof that the Petitioner would have accepted the State's plea offer but for trial counsel's alleged deficiency. Trial counsel testified that the State's plea offers were to resolve both of the Petitioner's aggravated rape charges. Despite trial counsel's advice that the Petitioner should accept the offers, the Petitioner rejected the offers because he was adamant that he would not be convicted of one of the offenses.

There is no factual basis to support the Petitioner's claims that he did not know that trial counsel would not put on proof at trial and that this supposed lack of knowledge caused him to reject a favorable plea offer and forego his right to testify. The Petitioner has failed to establish deficient performance on the part of trial counsel or any resulting prejudice, and he is not entitled to relief on this claim.

<u>Failure to Object to the Victim's In-Court Identification of the Petitioner</u>

The trial transcript reflects that the victim's in-court identification of the Petitioner occurred as follows:

[THE STATE]: Did Sergeant Oliver show you a line-up? Did he show you pictures of people?

[THE VICTIM]: Yeah.

[THE STATE]: Could you pick anybody out in that photo?

[THE VICTIM]: I couldn't because my memory had went blank and I couldn't hardly -- that was so weird and funny because I seen [sic] him plain face up you know and I looked at him. You know it just didn't look like him. He was little bit lighter complected in the face.

. . . .

[THE STATE]: So you told -- you told Sergeant Oliver you couldn't identify anybody. Right?

[THE VICTIM]: Yeah. I couldn't do it at first.

- 11 -

[THE STATE]:  Do you recognize [Petitioner] today in the courtroom?

[THE VICTIM]: Yeah.

[THE STATE]: You do?  Where's he sitting?

[THE VICTIM]: Right there.

[THE STATE]: Would you describe for us what he's wearing, please?

[THE VICTIM]: A green --

….

[THE VICTIM]: A green shirt, a green jumpsuit.  He's right there.

[THE STATE]: Your Honor, I'd ask the record to reflect that --

[THE STATE]: . . . [C]an you tell the color of the shirt he's wearing?  You're saying green?

[THE VICTIM]: I was -- well, maybe it's because of my cataract.  I can't hardly see good.

THE COURT: If you see the person that you're describing, could you just point him out for us?

[THE VICTIM]: Yeah.

THE COURT: Well, would you do that?

. . . (Witness Complied)

THE COURT: I'll let the record reflect she's pointing at the [Petitioner].

The Petitioner contends that he was denied the effective assistance of counsel based on trial counsel's failure to object to the victim's in-court identification as unconstitutionally suggestive.  He asserts that the victim had been unable to identify the Petitioner previously and that the jury "no doubt" relied upon the in-court identification to convict the Petitioner.  The State responds that the Petitioner has not established that

- 12 -

the victim's in-court identification was impermissibly suggestive. We agree with the State.

At the post-conviction hearing, trial counsel testified that he did not object to the victim's in-court identification because she admitted that she could not identify the Petitioner when shown a photographic lineup containing the Petitioner's photograph. Moreover, trial counsel testified that the Petitioner was the only person in the courtroom wearing a jail jumpsuit because the Petitioner refused to change into the clothing that trial counsel brought for the Petitioner to wear; the Petitioner "wanted to wear his jail clothes." Thus, if the courtroom identification was suggestive, it was the Petitioner's own fault. *But cf. Estelle v. Williams*, 425 U.S. 501, 504-05, 512 (1976) (concluding that the State's requirement that the defendant wear an orange prison jumpsuit during his trial violated the defendant's due process rights). In any event, even if trial counsel had objected and the objection been sustained, the "more damning" evidence was the evidence of the Petitioner's DNA that was found on the victim's vaginal swabs, and the Petitioner has offered no proof to suggest that the DNA identification was faulty. He has failed to establish either deficient performance or prejudice, and he is not entitled to relief based on this claim.

## Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 13 -